IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| United States of America *ex rel.* JOHNNY BROWN, <br><br> Petitioner, <br><br> vs. <br><br> TERRY MCCANN, Warden, Stateville Correctional Center, <br><br> Respondent. | Case No. 06 C 2730 |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

In 2000, an Illinois jury convicted Johnny Brown of one count of first degree murder and one count of concealment of a homicide; the trial judge sentenced Brown to consecutive terms totaling thirty-five years. Brown has petitioned the Court for a writ of habeas corpus under 28 U.S.C. § 2254. He alleges that his constitutional rights were violated by: (1) denial of effective assistance of appellate counsel; (2) denial of effective assistance of trial counsel; (3) a search and arrest made without probable cause; (4) prosecutorial misconduct; and (5) the failure of the prosecution to prove his guilt beyond a reasonable doubt. For the following reasons, the Court denies Brown's petition.

### Background

Factual findings by the state court are presumed correct in a federal habeas corpus proceeding unless they are rebutted by clear and convincing evidence. *Mahaffey v. Schomig*, 294 F.3d 907, 915 (7th Cir. 2005); 28 U.S.C. § 2254(e)(1). Because Brown has not rebutted the

Illinois Appellate Court's factual findings, the Court adopts the following account from the decision of that court in *People v. Brown*, No. 1-00-3671 (Ill. App. Dec. 3, 2001):

> Defendant's convictions arose from the fatal strangulation of the victim, Evelyn Gibson, at approximately 9 a.m. on November 24, 1998, in the apartment that defendant shared with his brother, Elmer Brown. Medical testimony established that the victim sustained puncture wounds to her neck, as well as various other bruises, lacerations and abrasions. A toxicology report showed that Gibson had both cocaine and alcohol in her system.
>
> Clifton Curtis, a neighbor of defendant, testified that at approximately 3:50 p.m., his daughter indicated that she smelled gas coming from the building. Curtis called the fire department and accompanied fire personnel to the basement of the building. While in the basement, they found a body in a garbage bag.
>
> Chicago police officer Julius Beacham testified that on that particular night, he received a call about an odor of gas coming from the building located at 2636 East 74th Street. Upon arriving at the scene, he spoke with the fire department supervisor and went to the basement of the building. The officer saw the victim's body wrapped in a green sheet with a black garbage bag covering the head of the body. He also detected a strong odor of gas. Officer Beacham then spoke to several people in front of the building, including defendant. The officer asked defendant what was "going on," and he immediately replied, "I don't know anything about that woman downstairs." Defendant was subsequently placed in custody.
>
> Officer Beacham and his fellow police officers then went to defendant's apartment. The officer noticed several drops of blood on the stairs leading to the apartment. After Elmer Brown was placed in custody, Officer Beacham went inside the apartment and noticed several additional drops of blood on the floor. The officer also saw an open closet that contained a mop with a "reddish-orange" tint. The officer also saw the same type of bedding sheets that were wrapped around the body. Both Elmer and defendant then were taken to the police station.
>
> Officer Alejandro Almazon testified that he was also at the scene and later interviewed Elmer and defendant at the police station. The officer asked defendant what he had done that day, and defendant replied that at approximately 3:45 p.m., his neighbor Curtis came to his apartment and asked him if he smelled gas. Defendant replied that he could not smell it, and went back into his apartment. Defendant further explained that a short time later he saw fire trucks as he walked to the liquor store. When he returned, another neighbor told him that the fire department had discovered a woman's body in the basement. Defendant

returned to his apartment until the police knocked on his door and asked him to go with them.

Officer Almazon then confronted defendant with certain information given by his brother. Defendant replied that Elmer was a liar and stated that he had no knowledge of a body in the basement. The following day, after obtaining a photograph of the victim, Officer Almazon had another conversation with defendant. The officer again asked him about his whereabouts on November 24, 1998, and defendant repeated the same story. Defendant was then asked about his whereabouts the previous day. He stated that at 9:30 p.m., he left his apartment to buy liquor. When he returned, he and his brother continued to drink until he fell asleep around 1 a.m. Defendant woke up at 8 a.m. and did not go to work because he felt ill. He did not leave the apartment until Curtis knocked on his door. The officer then showed him a picture of the victim, and defendant denied ever seeing her before. Officer Almazon again confronted defendant with what Elmer had told him, and defendant reiterated that his brother was lying. Later that evening, Officer Almazon again interviewed defendant. Defendant then told the officer that he would tell the truth "that he killed her." He told the officer that he used a two-pronged carving fork and extension cord to kill the victim.

On November 25, 1998, Assistant State's Attorney Catherine Quinlan interviewed defendant at the police station and reduced his statement to writing . . . . Defendant stated that on November 23, 1998, he cashed his $170 paycheck and was returning from a restaurant when he saw Gibson sitting in a van. Gibson approached defendant and asked if he wanted to "do something" for some money, which defendant explained meant sex in exchange for money. Defendant agreed to the proposition and gave Gibson $20. The two of them went to defendant's apartment and stayed in the living room for most of the evening. Elmer was in his bedroom during this time. Defendant and Gibson talked about her daughter during the course of the evening, and she kept asking him for money. She left briefly about four times, and defendant gave her money each time she left. On one of the two occasions that Gibson left the apartment, defendant hid $30 under one of his stereo speakers. According to defendant, Gibson was using crack cocaine when she returned to his apartment. Defendant finally went to sleep around 3 a.m., and did not wake up until his alarm went off at 8 a.m. the following day.

When defendant woke up, Gibson was searching through his belongings and under the stereo speaker. Defendant looked under the speakers and noticed that the $30 was missing. According to defendant, Gibson then offered to perform oral sex on him. Gibson and defendant had not engaged in any sexual act the night before, and he stated that this made him "very angry." She then took off her clothes, started performing oral sex on defendant, and then asked him where his

3

money was. Defendant again got "very upset" and told her that he did not have any more money. He then started yelling at her about the $30 that was missing. Gibson also started yelling, and she picked up an empty beer bottle, which defendant knocked out of her hand. He then picked up a bottle and hit Gibson on the head. After Gibson ran out of the living room, defendant followed her and hit her head a second time with the beer bottle. At this point, the bottle broke and Gibson started bleeding from the head. According to defendant, Gibson then ran into the kitchen and returned with a two-pronged fork. Defendant grabbed Gibson's arm with one hand and the fork with the other hand, and then forced the fork into her face. The two prongs went into her skin, and defendant saw blood coming from the top of her head and from below her eye. He further stated that he may have hit her again in the head with the fork, but did not remember exactly where. Gibson then went to the bathroom, returned with a bottle of bleach, and attempted to throw bleach on defendant. Gibson missed defendant and instead got bleach in her own eye, which began to burn. While she stopped to rub her eyes and ran into the bedroom, defendant grabbed an empty gin bottle. He stated that he was trying to calm Gibson down and was very angry about her taking all of his money. He was also angry about her not giving him "enough sex." Defendant then took the bottle and hit her a third time on her head. Gibson, who was leaning towards defendant rubbing her eyes, fell backwards off the bed. The bottle shattered all over the bed.

Defendant then picked up an extension cord that was on the floor. During this time, Elmer was "hysterical" and asked defendant to stop. Defendant began yelling at Gibson about taking his money and told her that "she would know never to take his money." He then got behind her on the bed, wrapped the cord around her neck, and squeezed it tightly for about 15 minutes. Defendant explained that he had the cord crossed in front of her neck and pulled it tightly with his arms extended in front of him. He was holding her body against him and supporting her weight. Defendant further stated that Gibson was making noises, so he pulled the cord tighter to make her stop. As defendant pulled the cord, he could hear Gibson choking and gasping. He then asked her if she would "stop and leave," and she screamed "no, no." After a few minutes, defendant felt Gibson's body "go limp," and stated that he did not hear any more noise from her. He felt the cord loosen up and then checked her pulse. Defendant stated that Gibson no longer had a pulse and had stopped breathing.

Defendant pulled Gibson's body into the bathroom using the sheets from the bed. Gibson continued to bleed from the head and the face. He then began "cleaning up the mess" with the bottle of bleach. Defendant disposed of Gibson's clothes in a garbage bag and placed the extension cord in the pantry. He used two garbage bags to cover the body, and cleaned up using a mop. Defendant then asked Elmer to help him move the body into the basement. Elmer left immediately after

transporting the body, but defendant stayed and poured gasoline over Gibson's body. He decided not to set the body on fire and returned to his apartment.

At trial, defendant testified that he and his brother had been drinking earlier that afternoon. At about 9 p.m., defendant left the apartment to get something to eat, and Gibson propositioned him. Gibson and defendant went to Elmer's apartment where she smoked cocaine while defendant drank alcohol. Gibson asked him for money and left the apartment three or four times. According to defendant, the two of them talked about their children and did not engage in sex that night. Defendant eventually passed out at around 3 a.m., while Gibson was still smoking.

When defendant woke up, he saw Gibson by the stereo speaker and asked her what she was doing. Gibson then took her clothes off and started performing oral sex on him. Gibson requested more money and defendant told her that he did not have any more. She then reached for a bottle and attempted to hit defendant, but he blocked her arm. Defendant stated that he was "afraid" because Gibson was "enraged," so he picked up the empty bottle and hit her on the forehead. Gibson attempted to hit defendant with another bottle, but defendant managed to hit her on the head again with the bottle. Gibson and defendant continued fighting about money. She then ran into the kitchen and returned with a fork in her hand. According to defendant, Gibson kept yelling that she wanted more money as she lunged at defendant with the fork. Defendant managed to twist the fork toward Gibson, and he stated that the fork might have hit her. Gibson then ran to the bathroom, returned with a bottle of bleach, and attempted to throw bleach at defendant. Defendant stated that he was scared and thought Gibson was trying to kill him. After she rubbed her eyes, defendant stated that Gibson "kept coming" at him in a "rage," so he hit her with a gin bottle to protect himself. In an attempt to "calm her down" so she could leave, defendant got the extension cord and wrapped it around her shoulders. According to defendant, the cord slipped up her arms because she was moving, and somehow "went around her neck." He clarified that he never wrapped the cord around her neck. Defendant asked Gibson if she would leave if he let her go, and she replied "no." He then put pressure on the cord for about five seconds to a minute, and asked her the same question. He continued to do this until her body went limp. Defendant testified that he did not wrap the cord around her neck for 15 minutes. He also clarified that he had no intent to kill Gibson and was acting in self-defense. Finally, defendant stated that the reason why he took Gibson's body down to the basement and poured gasoline over it was because he was scared.

Defendant clarified that he was not angry about the money or the fact that Gibson did not have sex with him. He also stated that he was not injured and only received a small scratch on his knuckles. Finally, defendant stated that he signed

5

each page of his written statement but only glanced through it because he assumed the assistant State's Attorney would include everything he said to her. He stated that when she read his statement back to him, he really was not listening because he was tired.

*Id.* at 2-9.

## Discussion

1. **Procedural default**

Respondent contends that all but two of Brown's claims are procedurally defaulted because he failed to raise them at all levels of the proceedings in state court. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999) ("[S]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process."). A district court should deny a petition without reaching the merits if the petitioner "either failed to exhaust all available state remedies or raise all claims before the state courts." *Dressler v. McCaughtry*, 238 F.3d 908, 912 (7th Cir. 2001).

Respondent argues that Brown's claims that his appellate counsel was ineffective; his trial counsel was ineffective (except for the claim related to the failure to call his brother as a witness); the police violated his Fourth Amendment rights; and the prosecutor's arguments were improper are procedurally defaulted. According to respondent, Brown failed to assert these claims on appeal from the dismissal of his post-conviction petition.

Brown raised each of these issues in his state post-conviction petition. The trial court summarily dismissed the petition, holding that he had waived each of them, except for ineffective assistance of appellate counsel, because he should have raised them on direct appeal from his conviction. Resp. Ex. H at 4.

The State Appellate Defender was appointed to represent Brown on appeal of the denial of his post-conviction petition. In his appellate brief, appointed counsel argued that the trial court improperly relied on waiver to summarily dismiss Brown's petition and erred by dismissing the petition because it stated the gist of a constitutional claim. *See* Resp. Ex. I. In support of the latter argument, counsel contended that Brown's claim that trial counsel should have investigated and called Brown's brother Elmer was sufficient to preclude summary dismissal of the petition.

The appellate court agreed with Brown that the trial court should not have applied the doctrine of waiver at the first stage of the proceedings. Resp. Ex. L at 3. The court noted, however, that although Brown had asserted several constitutional violations in his petition, he argued only his ineffective assistance of trial counsel claim on appeal. Instead of reversing the trial court and remanding for further consideration of Brown's claims, the court confined its review to Brown's ineffective assistance of trial counsel claim. *Id.* at 4. The appellate court found that Brown had not stated the gist of a meritorious claim. *Id.* at 6.

After the appellate court affirmed the dismissal of his post-conviction petition, Brown filed a motion to proceed *pro se* and to dismiss his appointed counsel, along with a *pro se* petition for rehearing. Brown Ex. A, B. In his motion to proceed *pro se*, Brown asserted that his appointed counsel "placed [him] in [jeopardy] of procedural default" by not raising all the issues included in his post-conviction petition. Brown Ex. A at 3. In his *pro se* petition for rehearing, Brown asserted each of the arguments he had previously raised in his post-conviction petition. The appellate court granted Brown leave to proceed *pro se* and denied his request for rehearing without comment. Brown then asserted these same issues in his petition for leave to appeal to the Illinois Supreme Court.

7

Brown argues that he should not be found in procedural default because his appointed counsel "refused to raise the actual claims in the original brief the petitioner presented." Reply at 2. Respondent acknowledges that Brown raised his federal claims in the petition for rehearing but argues that the filing was not sufficient to preserve them.

Illinois Supreme Court Rule 341(e)(7) provides that arguments raised for the first time in a petition for rehearing are considered waived. The Court cannot say, however, that the state appellate court relied on this procedural rule in dismissing Brown's *pro se* petition for rehearing; the court's order denying that petition did not give a reason.

Even were this Court to infer that the state court ultimately considered Brown's claims to have been forfeited because he did not argue their substance in his appeal from the dismissal of the post-conviction petition, that would not prevent review of the claims on their merits. A procedural rule invoked as the basis for defaulting a claim on federal habeas review must be one that was firmly established and regularly followed at the time when it was applied. *See, e.g., Ford v. Georgia*, 498 U.S. 411, 424 (1991); *Brown v. Powell*, 227 F.3d 908, 912 (7th Cir. 2000); *Thomas v. McCaughtry*, 201 F.3d 995, 1000 (7th Cir. 2000).

Long before February 2005, when the state appellate court affirmed the dismissal of Brown's post-conviction petition, the Illinois Supreme Court had declared that a post-conviction petition could not be dismissed at the summary review stage as frivolous or patently without merit (the conclusion Brown's trial judge reached) based on an affirmative defense. *See People v. Boclair*, 202 Ill. 2d 89, 100-01, 789 N.E.2d 734, 741-42 (2002) (limitations defense). The First District of the Illinois Appellate Court applied *Boclair* in 2003, before Brown's trial judge ruled and a year before the brief was filed in Brown's post-conviction appeal, to preclude

8

dismissal at the initial stage based on the doctrines of waiver and *res judicata*. *See People v. Blair*, 338 Ill. App. 3d 429, 431-32, 788 N.E.2d 240, 242 (2003). Though the Illinois Supreme Court reversed *Blair* in June 2005, *see People v. Blair*, 215 Ill. 2d 427, 831 N.E.2d 604 (2005), the state of the law at the time the trial court dismissed Brown's petition and when he filed both his opening and reply briefs on appeal was such that the trial court's decision to dismiss the petition summarily based on waiver was contrary to Illinois law as it then existed.

More importantly for present purposes, the First District's consistent practice in overturning post-conviction dismissals based on waiver or *res judicata* was, at the time of Brown's appeal, to reverse the summary dismissal of the case and remand for purposes of requiring a response by the state and plenary consideration of the petition. *See, e.g., Blair*, 338 Ill. App. 3d at 432, 788 N.E.2d at 243. Indeed, the appellate court's practice was to refuse to consider the merits of the claims unless the trial court had done so in the first instance. *See id.*

Though the Illinois Supreme Court's *Blair* decision intervened between the briefing on Brown's post-conviction appeal and the appellate court's decision, under the circumstances the Court is unpersuaded that the procedural rule that the state court might have applied in denying Brown's *pro se* petition for rehearing was one that was firmly established and regularly followed at the time. Brown's appointed counsel did exactly what the law told him he should do: he argued the impropriety of the summary dismissal under *Boclair* and the First District's *Blair* decision. By contrast, he did not argue the merits of the entirety of Brown's post-conviction petition–because the law did not suggest that he should do so. Rather, he simply included a reference to one of Brown's claims to illustrate the fact that the petition stated the gist of a constitutional claim, the minimal standard required to avoid summary dismissal upon initial

9

review.

This was anything but a waiver or forfeiture of Brown's remaining claims. Nor did the appellate court expressly so hold. Rather, it simply held that Brown had argued the merits of only one of his claims, and it proceeded to address that argument. *See* Resp. Ex. L at 4-7. In short, the Court cannot say that the appellate court's decision—either its ruling affirming the dismissal or its summary denial of Brown's *pro se* petition for rehearing—clearly and expressly relies on a state procedural bar. *See Coleman v. Thompson*, 501 U.S. 722, 735 (1991); *Harris v. Reed*, 489 U.S. 255, 263 (1989).

For these reasons, the Court will address Brown's claims on the merits.[1]

## 2. Ineffective assistance of trial counsel

Brown argues that his trial counsel was ineffective in various respects. Specifically, he contends that his trial counsel failed to order fingerprint analysis of several pieces of evidence, failed to investigate the victim's "propensity for violence," failed to call Brown's brother Elmer as a witness at trial, and failed to file a motion to quash his arrest and suppress evidence.

To prevail on his ineffective assistance of counsel claims, Brown must show that counsel's conduct fell below "an objective standard of reasonableness" and "there is a reasonable probability that, but for counsel's incompetence, the result of the trial would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). To the extent Brown's ineffective assistance claims were reviewed on the merits in the state court, Brown "must do

---

[1] The appellate court unquestionably addressed on the merits Brown's claims that trial counsel was deficient in failing to investigate and call Brown's brother Elmer as a witness, making plenary review of that claim appropriate irrespective of the default issues discussed earlier.

more than show that he would have satisfied *Strickland's* test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied *Strickland* incorrectly. Rather, he must show that the [state court] applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Bell v. Cone*, 535 U.S. 685, 698-99 (2002) (citations omitted). Brown cannot meet either of these standards.

It was not objectively unreasonable for the appellate court to find that trial counsel was not deficient for failing to call Brown's brother Elmer as a witness. The appellate court concluded that Elmer's testimony would not have altered the trial's outcome because, according to Elmer's affidavit submitted with the state post-conviction petition,[2] Elmer was asleep during the events leading up to Gibson swinging the bottle of bleach at Brown. The Court also noted that the testimony would have been offered by Brown's brother and thus would have been scrutinized for bias or interest. *See People v. Reed*, 80 Ill. App. 3d 771, 781, 400 N.E. 2d 688, 695 (1980). In sum, the appellate court found that Elmer's affidavit was not of such magnitude that his proposed testimony would have changed the outcome at trial: the state introduced overwhelming evidence of Brown's guilt, and Brown himself had told the police that his brother was "a liar." Irrespective of how this Court would determine the matter in the first instance, the appellate court did not unreasonably apply *Strickland*.

---

[2] Brown has attached as an exhibit to his reply brief the petition for rehearing he filed in the appellate court. The petition for rehearing includes as an exhibit an affidavit which Brown describes as an affidavit from his brother Elmer. The affidavit, however, is signed by Brown himself, not by Elmer, and it is dated August 25, 2006, over a year after the appellate court denied Brown's petition for rehearing on April 19, 2005. Attached to Brown's state post-conviction petition, however, is an affidavit signed by Elmer Brown dated May 20, 2003. Resp. Ex. S at C32-33. The Court assumes that this is the affidavit that the appellate court considered.

As noted earlier, the state courts did not address Brown's other ineffective assistance of trial counsel claims on the merits. The Court, therefore, is required to "dispose of the matter as law and justice requires." *Harrison v. McBride*, 428 F.3d 652, 665 (7th Cir. 2006); 28 U.S.C. § 2243. Even assuming that trial counsel acted in an objectively unreasonable manner in failing to offer evidence of Gibson's alleged "propensity for violence," Brown has failed to show the requisite prejudice, as he has offered no evidence of such a propensity (in his post-conviction petition, he referred only to earlier arrests of Gibson for non-violent offenses, *see* Resp. Ex. G at 6). Second, trial counsel's decision not to order fingerprint testing of various objects used in the altercation was not objectively unreasonable. Brown testified that Gibson attacked him with a beer bottle, bleach container, and fork; the state did not attempt to prove otherwise. Evidence that Gibson's fingerprints were found on these objects would have been cumulative and unlikely to bolster Brown's self-defense theory.

Finally, Brown claims that his trial counsel was ineffective because he failed to file a motion to quash his arrest and suppress evidence obtained as a result of the arrest. The police arrested Brown after he spontaneously told Officer Beacham that he didn't "know anything about that woman downstairs" even though it had not yet been made public that a body had been found in the apartment building. The police searched Brown's apartment after seeing a trail of blood leading up the stairs, and, more importantly, after receiving permission from Elmer, who lived in the apartment. During the search, the police located, among other things, a bloody mop and the same type of sheets that were used to wrap the victim's body. Based on these facts, the police unquestionably had probable cause to search the apartment and arrest Brown. Trial counsel's decision not to file what almost certainly would have been a futile pre-trial motion was not

12

unreasonable.

For these reasons, Brown is not entitled to a writ of habeas corpus on the basis of ineffective assistance of trial counsel.

**3.      Insufficient evidence**

Brown also argues that the prosecution failed to prove that he was guilty of first degree murder. Rather, Brown contends he was proven guilty of, at most, second degree murder on a theory that he actually believed he was acting in self-defense but that his belief was unreasonable. *See* 720 ILCS 5/9-2(a)(2). The appellate court rejected this claim on direct appeal, finding that it was reasonable for the jury to conclude that Brown had no basis to support a belief that deadly force was necessary to protect his life. Resp. Ex. D at 10-11.

The Due Process Clause requires a court reviewing a criminal conviction to determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On habeas review, this Court must determine whether the appellate court applied the *Jackson* standard reasonably. *Gomez v. Acevedo*, 106 F.3d 192, 198-200 (7th Cir. 1997). The Court holds that the appellate court did so. As respondent points out, the appellate court actually applied a standard more deferential to Brown than that articulated in *Jackson*—it accepted Brown's testimony as true. Even applying the more deferential standard, the appellate court determined that, "considering the victim's condition [after fighting with Brown], defendant had no basis to believe that deadly force was necessary to protect himself. Defendant nonetheless picked up the extension cord and yelled that 'she would know never to take his money.' Defendant strangled the victim until her body went limp, hid her

13

body in the basement, and cleaned up the mess." Resp. Ex. D at 11. There is no basis for the Court to disturb this determination.

4. **Fourth Amendment violations**

Brown argues that the police violated his Fourth Amendment rights by arresting him and searching his apartment without probable cause. When the state has provided for "a full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Stone v. Powell*, 428 U.S. 465, 494 (1976). Even when a petitioner contends that he lacked a full and fair opportunity to litigate his claim in state court, the Seventh Circuit has held that Fourth Amendment claims are not cognizable on habeas review if the petitioner did not clearly present the claim to the state courts. *Turentine v. Miller*, 80 F.3d 222, 225 (7th Cir. 1996).

Brown's Fourth Amendment claim is not cognizable on habeas review because he filed neither a motion to suppress nor raised a Fourth Amendment claim on direct appeal. Brown argues in passing that trial counsel's failure to file a motion to suppress constituted ineffective assistance of counsel, but as the Court explained in section 2, *supra*, this argument has no merit. Accordingly, under *Stone*, Brown's Fourth Amendment claim is not cognizable on habeas review.

5. **Prosecutorial misconduct**

Brown contends that the prosecutor made improper arguments in opening and closing statements that violated his right to a fair trial. Specifically, Brown argues that he was prejudiced by the following statements: Brown strangled Gibson "for fifteen minutes"; he "placed a noose

14

around the victim's neck"; there was a trail of blood to his apartment door; and he attempted to burn Gibson's body.

The Supreme Court has held that when reviewing a prosecutor's arguments, the "relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 180 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974)). The first question is whether the prosecutor's comments were improper. If so, then the Court must decide whether they unfairly prejudiced the defendants. *See, e.g., Darden*, 477 U.S. at 180-81; *United States v. Gilbertson*, 435 F.3d 790, 796-97 (7th Cir. 2006). Because the state courts did not address this claim on the merits, the Court will do so, applying the standards set forth in *Darden*.[3]

The prosecutor's arguments at Brown's trial were not improper. Rather, the comments were consistent with the evidence presented at trial. A police officer testified that he noticed drops of blood leading to Brown's apartment, and Brown's confession and trial testimony supported the argument that he strangled Gibson with an extension cord. Brown stated in his confession that he strangled Gibson for "fifteen minutes." The only comment by the prosecutor that did not have precise support in the record was that Brown attempted to burn Gibson's body. Brown, however, admitted that he doused Gibson's body with gasoline. It was reasonable to infer either that he attempted to burn her body and failed or that he belatedly decided not to try. The prosecutor argued the former, and defense counsel was free to argue the latter. Either way, the prosecutor's statement that Brown attempted to burn Gibson's body did not stray

---

[3] Although the trial court held that Brown waived his prosecutorial misconduct claim, the court also discussed some of the principles regarding prosecutorial misconduct and appeared to indicate that it believed Brown's claim lacked merit.

unreasonably far from the evidence.

Because the prosecutor did not misstate the evidence, the Court need not address the remaining factors. *See Gilbertson*, 435 F.2d at 797.

**6.      Ineffective assistance of appellate counsel**

Brown argues that his appellate counsel was ineffective because he raised only one issue, insufficiency of the evidence, on direct appeal. The trial court rejected this argument on the merits when it denied Brown's post-conviction petition.

Brown contends that appellate counsel should have also raised the issues he asserted in his post-conviction petition and now raises in his habeas petition. However, appellate counsel "need not (and should not) raise every nonfrivolous claim, but rather may select among them . . . to maximize the likelihood of success on appeal." *Smith v. Robbins*, 528 U.S. 259, 288 (2000). To successfully argue that appellate counsel was ineffective for failing to raise particular claims, a petitioner must show that the "ignored issues are clearly stronger than those presented." *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986). None of Brown's other potentially appealable issues were particularly strong—especially in light of Brown's confession and testimony at trial.[4] Appellate counsel apparently determined that Brown's best chance to succeed on appeal would be to argue that he had proven by a preponderance of the evidence that he was justified to use deadly force to protect himself. The Court does not believe that appellate counsel was ineffective

---

[4] Despite the state trial court's ruling that Brown's claims of ineffective assistance of trial counsel were forfeited because they were not asserted on direct appeal, this Court is skeptical that claims that almost certainly would have had to be based on evidence outside the trial record–the failure to call Elmer Brown and the failure to introduce evidence of Gibson's alleged propensity for violence—actually could have been raised on direct appeal. An appellate attorney quite obviously does not act in a deficient manner by failing to raise issues outside the record of the trial proceedings.

when he chose to advance this argument instead of others that, though not frivolous, had little chance of success.

The state trial court was not objectively unreasonable when it rejected Brown's ineffective assistance of appellate counsel claim raised in his post-conviction petition. Brown is not entitled to a writ of habeas corpus on this basis.

**Conclusion**

For the reasons stated above, the Court denies Brown's petition for writ of habeas corpus. The Clerk is directed to enter judgment in favor of respondent.

_____
  MATTHEW F. KENNELLY
  United States District Judge

Date: October 5, 2007